# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| WILLIAM T. RUCKER<br>and MARIE RUCKER,<br>    Plaintiffs,<br><br>    v.<br><br>RDS FARM, INC., DAVID L. ALLEN<br>NATIONAL RAILROAD PASSENGER<br>CORPORATION and CSX<br>TRANSPORTATION, INC.,<br>    Defendants, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CAUSE NO.: 2:15-CV-272-TLS |

-------------------------------------------------- )

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER<br>CORPORATION d/b/a AMTRAK,<br>    Cross-Claimant,<br><br>    v.<br><br>DAVID L. ALLEN and RDS FARM, INC.<br>    Cross-Defendants, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

-------------------------------------------------- )

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER<br>CORPORATION d/b/a AMTRAK,<br>    Third Party Plaintiff,<br><br>    v.<br><br>RONALD ALLEN,<br>    Third Party Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OPINION AND ORDER

On June 12, 2013, in rural Indiana, an Amtrak passenger train collided with a farm tractor hauling a nurse tank filled with anhydrous ammonia as the tractor's driver, David Allen, crossed railroad tracks owned by CSX Transportation, Inc. William Rucker, who was engineering the train on behalf of his employer, National Railroad Passenger Corporation (Amtrak), has sued Allen, RDS Farm, Inc. (the Farm) that owns the tractor involved in the collision, Amtrak, and CSX Transportation, Inc. (CSX Transportation). Marie Rucker brings loss of consortium claims

against CSX Transportation.

Amtrak and CSX Transportation have moved for summary judgment [ECF No. 48] on the claims that Rucker asserts against them, which include claims against Amtrak under the Federal Employers Liability Act (FELA), 45 U.S.C. § 51, *et seq.*, and the Locomotive Inspection Act (LIA), 49 U.S.C. § 20701, *et seq.*, and a common law negligence claim against CSX Transportation. In light of the derivative nature of the loss of consortium claim, CSX Transportation also requests summary judgment on that claim.

## BACKGROUND AND STATEMENT OF FACTS

The parties have lodged numerous evidentiary objections. (*See* Pls.' Mot. to Strike Exs. to the Mot. for Summ. J., ECF No. 51 (moving to strike White County Indiana Incident Report No. 902035807, Declaration of Douglas T. Gannaway, Declaration of Russell Schanlaub, Declaration of Brian Pogue, and Declaration of Sean Cronin); Defs.' Mot. to Strike the Aff. and Report of Stuart Nightenhenlser, ECF No. 60; Pls.' Mot. to Strike the Defs.' Suppl. Designation of Evid. in Supp. of Mot. for Summ. J., ECF No. 63; Defs.' Mot. to Strike Portions of the Dep. of Brian Pogue, ECF No. 77.) The Court will address these motions only as they pertain to evidence that is material to the outcome of the pending Motion for Summary Judgment. If evidence is not relevant, the Court will not consider it, as "[i]rrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). Moreover, the Court is mindful that Rule 56 requires that an affidavit used to support or oppose a summary judgment motion "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is

competent on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). However, personal knowledge is not a rigid requirement; it also "includes opinions and inferences grounded in observations or other first-hand experience." *United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999) (citing *Visser v. Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991)).

Despite the numerous motions to strike, the facts contained below are not in dispute. Facts that are challenged on an evidentiary basis, or otherwise disputed, will be addressed in the analysis section of the Opinion and Order as necessary for resolution of the Motion for Summary Judgment.

On June 12, 2013, at around 8:45 a.m., David Allen was traveling north on County Road 200 West driving a John Deere farm tractor, which was pulling a disc harrow for tilling soil and an anhydrous ammonia nurse tank. At the same time, an Amtrak train being operated by Engineer William T. Rucker was traveling northwest on a CSX Transportation owned railroad track that would intersect with County Road 200 West. As the train approached the crossing, Rucker observed Allen's tractor nearing the tracks. He testified that he could tell it would be difficult for Allen to get matters under control, so he began blowing the train's horn, well in advance of the whistle post for the crossing. Allen had not seen or heard the train and drove the tractor onto the crossing. As the train approached the crossing, Rucker sounded the horn multiple times and applied braking, hoping that Allen would be able to cross the tracks before the train arrived at the intersection.

Rucker was seated in the engineer's seat on the right side of the lead locomotive. The

lead locomotive struck the disc harrow at about 47 miles per hour, and the impact separated the anhydrous ammonia tank. The momentum of the locomotive carried it through the impact without causing an abrupt stop. The anhydrous ammonia tank was not ruptured, but the hoses were filled with ammonia at the time of impact, and one of the applicator hoses broke the engineer-side window of the locomotive. According to Rucker, he inhaled the anhydrous ammonia and it splattered on his right arm, shoulder, and head.

The intersection is one that Allen had encountered hundreds of times before the day of the collision. Allen testified that he would have encountered signage as he approached the crossing, including a yield sign and a crossbuck advising of the presence of two sets of tracks. He also testified that there is a stop bar, and pavement markings to indicate the approach to the railroad crossing. Allen testified that he does not always come to a complete stop before traveling over the crossing, as it depends on whether he could see clearly. If he could see clearly, he would not stop. If he could not see clearly, he would stop. Allen does not know why he did not stop on the day of the collision. Allen estimates that his speed as he approached the crossing was between 6 to 10 miles per hour, perhaps as high as 12 miles per hour. While he thinks he would have slowed as he approached the crossing, he admits that he did not stop prior to driving onto the railroad tracks.

When asked what made that particular railroad crossing a difficult one, Allen answered:

A. I would say the angle at which the railroad track is intersecting the road and then the trees and obstructions that are there make it difficult.

Q. Okay. Now, you said trees. Where are the trees that pose a difficulty?

A. Between the—or they're right next to the tracks, or next to the tracks.

(Allen Dep. 40, ECF No. 50-1.) Allen explained that the trees at issue were in the southeast

quadrant of the intersection. He also stated that, as far as obstructions were concerned, the trees were the only problem. However, he also believed that the angle at which the track intersects the road when you are traveling north made it more difficult to see a train approaching from the southeast, because a driver had to "really turn his head back around" to the right to see the train. (*Id.*)

## ANALYSIS

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, a nonmovant must be able to show that a reasonable jury could return a verdict in his favor; if he is unable to "establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), summary judgment must be granted. A bare contention that an issue of fact exists is insufficient to create a factual dispute, but the court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). A fact must be outcome determinative under the governing law to be considered material. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598–99 (7th Cir. 2000).

**A.    FELA and LIA Claim Against Amtrak Regarding Condition of the Locomotive Cab**

Rucker claims that Amtrak is liable to him under the Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq.*, and the Locomotive Inspection Act, 49 U.S.C. § 20701, *et seq.* based on the condition of the locomotive. He maintains that the locomotive cab did not contain adequate window safety glazing, and that it was not an overall crashworthy cab. Rucker also asserts that there is genuine issue of material fact whether insect debris on the windshield caused by the absence of window washer fluid impaired his view of the crossing and the approaching farm tractor.

FELA was enacted "to provide a remedy to railroad employees injured as a result of their employers' negligence." *Waymire v. Norfolk & W. Ry. Co.*, 218 F.3d 773, 775 (7th Cir. 2000) (citing *Kossman v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 211 F.3d 1031, 1035 (7th Cir. 2000)). Under the statute,

> Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. This statutory language creates "a general duty to provide a safe workplace." *McGinn v. Burlington N. R.R. Co.*, 201 F.3d 295, 300 (7th Cir. 1996). It "neither prohibits nor requires specific conduct by a railroad." *Waymire*, 218 F.3d at 775. The Locomotive Inspection Act establishes safety standards for locomotives and their parts to be "in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701(1). The Federal Railroad Administration has issued regulations concerning locomotive safety standards

and inspections. *See* 49 C.F.R. §§ 200 *et seq.*

To recover under FELA, a plaintiff must prove the elements of negligence, including duty, breach, foreseeability, and causation. *Fulk v. Ill. Cent. R.R. Co.*, 22 F.3d 120, 124 (7th Cir. 1994). A defendant injured due to a violation of the LIA may bring an action under FELA. *Lilly v. Grand Trunk W. R.R. Co.*, 317 U.S. 481, 485 (1943) (addressing the Boiler Inspection Act (BIA), 45 US.C. § 23, which was the precursor to the LIA). A violation of the LIA is negligence per se under FELA. *Coffey v. Ne. Ill. Reg'l Commuter R.R. Corp. (METRA)*, 479 F.3d 472, 477 (7th Cir. 2007) (stating that a railroad employee claiming a violation of the LIA,"is required to prove only the statutory violation and thus is relieved of the burden of proving negligence") (quoting *Crane v. Cedar Rapids & Iowa City Ry.*, 395 U.S. 164, 166 (1969)). Once the LIA violation, and thus, the breach of a duty, has been established, a relaxed standard applies to the causation inquiry. *Id.* (noting that the injury need only be caused "in whole or in part" by the violation); *see also Lynch v. Ne. Reg'l Commuter R.R. Corp.*, 700 F.3d 906, 912 (7th Cir. 2012) (stating that the Supreme Court has reaffirmed that FELA causation language refers to whether a breach of a duty was a cause, "even in the slightest," to the employee's injury).

To support his LIA claim, Rucker points to the regulations regarding windshield glazing, 49 C.F.R. § 223, *et seq.*, which require that locomotives, "built or rebuilt after June 30, 1980, must be equipped with certified glazing in all locomotive cab windows." 49 C.F.R. § 223.9(a). Appendix A to Part 223 requires glazing to be tested for durability, and then marked according to the tests that have been passed as either "FRA Type I" or "FRA Type II" glazing. Rucker claims that the windshield in his locomotive was not adequate.

Amtrak's fleet engineer, Sean Cronin, stated in a sworn Declaration that the locomotive

was equipped at the time of the collision with durable windshield glass and side-facing glass in compliance with 49 C.F.R. § 223. Cronin states that he has personal knowledge of the matters contained in the Declaration, has been employed with Amtrak since 2009, and is familiar with the specifications of the locomotive in question. He further states that he is familiar with the locomotive's repair and maintenance history, and that he conducted a personal inspection of the locomotive in December 2015. He attached a photograph taken in December 2015 that shows a sticker on the interior cab that certifies that the locomotive is fully equipped with FRA Part 223 safety glazing.

Rucker has moved to strike Cronin's Declaration on grounds that it was not made on personal knowledge, and that the "maintenance history record" Cronin relied on was not specifically identified or previously produced in discovery. The Court does not find any basis to strike Cronin's Declaration. In addition to his statement that his assertions are based on his personal knowledge, Cronin's personal knowledge can be inferred from the other facts he supplies, such as the positions he held with Amtrak, the duties accompanying those positions, and his access to the maintenance history of the locomotive at issue.

Neither is the dispute about the production or identification of the maintenance history records a basis to strike Cronin's Declaration. Although Rucker's counsel asserts that Amtrak did not produce it during discovery, defense counsel disputes this, and asserts that it was produced on or about December 15, 2015. Rucker has not responded to counsel's assertion. If Rucker believed he needed additional discovery, or that he had been denied relevant discovery, remedies were available under Federal Rule of Civil Procedure 56(d) or Rule 37. In fact, with respect to the Motion for Summary Judgment now under consideration, Rucker previously

exercised the option to request suspension of the summary judgment briefing and seek additional discovery with respect to certain witnesses.

In any event, Rucker has not come forth with any evidence of his own to show that the windows were *not* in compliance and, thus, has not established a per se violation that would relieve him of the burden to prove Amtrak's negligence. Once Amtrak showed that the evidentiary materials did not establish the presence of a genuine dispute, or that Rucker could not produce admissible evidence to support his claim that the window was not LIA compliant, it was incumbent on Rucker to dispute those assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 322–23 (noting that summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Rucker himself does not believe there was a defect with the window. (Rucker Dep. 129 ("Q. Are you making some claim that there was something defective with that window? A. No, sir.").) Because there has been a complete failure on Rucker's part to show that the window did not meet the LIA's safety glazing requirements, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Rucker's brief also contains a vague allegation about the crashworthiness of the locomotive. However, there is a complete absence of probative facts to support a conclusion that

the cab was not crashworthy. The Plaintiff has not highlighted any aspect of the locomotive cab that was not in proper condition and safe to operate without unnecessary danger of personal injury. The only possible condition he mentions in his brief in opposition to summary judgment relates to "whether the presence of debris on the windshield of the locomotive caused by the absence of window washer fluid impaired Rucker's view of the crossing and the approaching farm tractor." (Pls.' Mem. in Opp'n 22, ECF No. 50.) Rucker testified that Amtrak did not fill the locomotive with a sufficient amount of windshield washer fluid for a 200-mile trip. (Rucker Dep. 109). However, he admitted that this did not contribute to the locomotive striking the tractor (*id.* at 112) and did not impair his ability to see the tractor as it was approaching the crossing (*id.* at 113; *see also id.* at 52–53 (explaining that he started blowing his whistle and applying the brakes well in advance of the whistle stop because he saw a blur of green and yellow and recognized it as a John Deere tractor).) Based on these undisputed facts, and the lack of any competing facts that might support an alternative conclusion, no reasonable jury could find that the inadequate level of washer fluid was even a slight cause of Rucker's injuries.

Rucker may be asserting a claim that Amtrak failed to install certain equipment. Although he does not provide legal analysis to support such a claim, he notes the following in his brief: "Amtrak implies that Rucker waived any claim as to a seat belt and padding in the cab of the locomotive; however, Amtrak failed to even ask such a question of Rucker." (Pls.' Mem. in Opp'n 22.) Whether Rucker intended to waive any such claim is not as important as whether he has presented any evidence from which a jury could find in his favor based on the failure to

equip the locomotive with seat belts and padding.[1] Rucker has not offered evidence to suggest that providing a cab without a seat belt and padding is a breach of the duty to provide a reasonably safe workplace—either because it violates the LIA or because it is general negligence recoverable under FELA.

The regulations at 49 C.F.R. § 229.119 cover the subject matter of locomotive cab safety requirements. The regulations contain no requirements for cushioning devices. Section 229.119(a) requires that cab seats be securely mounted and braced, but says nothing about air bags, seat belts, harnesses, or other means of restraint. Because the regulations do not require the installation of seat belts or padding, and the Court does not find these devices to be integral or essential parts required for the operation of a locomotive, *McGinn*, 102 F.3d at 229 (stating that the BIA does not hold carriers liable for failure to install equipment unless is was required by federal regulations or constituted an "integral or essential part of a completed locomotive") (citing *S. Ry. Co. v. Lunsford*, 297 U.S. 398, 402 (1936)), there is no claim under the LIA based on the absence of a restraint system or padding.

Putting aside the LIA, Rucker cannot otherwise establish the elements of negligence under FELA for the simple reason that Rucker was not jostled around in the locomotive or knocked from his seat during the accident. (Rucker Dep. at 66, 68, 72.) The only movement he made was to duck down to the side as the farm equipment crashed through the window. (*Id.* at 69.) Rucker did not identify any injuries that could be attributed to the lack of restraints or padding. (*Id.* at 81–83 (testifying to "a little bit of a stiff neck" a "few small abrasions" from the

---

[1] During his deposition, Rucker was asked whether he was wearing a restraint system, and clarified that he had "never seen a locomotive with a seat belt." (Rucker Dep. 58–59.) He did not, at any point in his deposition, make a complaint about the lack of such a system.

broken safety glass, and skin marks, irritation, and sores where the anhydrous ammonia made contact).) Thus, even if it could be considered a breach under FELA not to have a restraint system or padding, the breach did not cause any of Rucker's injuries.[2]

Lastly, Rucker identified that the cab was dirty, the toilet had not been cleaned in several days, there was no drinking water or supply kit, and the train contained an inadequate amount of windshield washer fluid as matters that contributed to his working environment. Rucker admitted that he was not claiming that any of these things contributed to the locomotive striking the tractor (Rucker Dep. 109–12), and there is no evidence in the record to suggest that they contributed to the injuries he suffered. Nothing Rucker complained of would violate the "duty to keep all parts and appurtenances of its locomotives in proper condition and safe to operate without unnecessary peril to life and limb," *McGinn*, 102 F.3d at 299 (setting forth standard for violation of the Boiler Inspection Act), or otherwise violate the duty to provide a safe workplace. "[A] plaintiff must proffer some evidence of the defendant's negligence in order to survive summary judgment" on a FELA claim, *Holbrook v. Norfolk S. Ry. Co.*, 414 F.3d 739, 742 (7th Cir. 2005), and Rucker has presented none as it relates to the condition of the locomotive.

---

[2] The claim regarding crashworthiness, as alleged by Rucker, would appear to fall within the category of defective design. With respect to state law, the Supreme Court has held that, "common-law claims for defective design . . . are aimed at the equipment of locomotives," and therefore "plainly encompasse[d]" by the LIA. *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 634 (2012). The Supreme Court in *Kurns* further described the LIA's occupation of the field of regulating locomotive equipment as "categorical," with "no exception for state common-law duties and standards of care." *Id.* at 637. It may be, as Amtrak argues, that the LIA's occupation of the entire field would also apply to exclude FELA claims—not just state claims—that encroach on the field of regulating locomotive equipment. *Cf. Waymire*, 218 F.3d at 776 (holding that a FELA negligence claim was precluded where it attempted to hold the defendant to a higher standard than that required by the Federal Railroad Safety Act of 1970). However, the Court need not decide whether the LIA precludes a FELA general negligence claim because Rucker has not established the elements of breach or causation.

**B.     State Law Claims Against CSX Transportation**

**1.     *Hazardous Crossing***

Rucker claims that CSX Transportation is liable under state law because the County Road 200 West crossing where the accident occurred is unreasonably hazardous. CSX Transportation argues that, because the reflectorized yield sign and cross-buck at the crossing were installed using federal funds in accordance with an agreement between INDOT and CSX Transportation, Federal Railway Safety Administration regulations preempt Rucker's claim that the crossing was hazardous, or that additional or different crossing protections or warning devices should have been installed. Rucker responded, initially, that the evidence of the agreement was insufficient. This challenge hinged on a typographical error in CSX Transportation's brief, and not on any defect in the supporting documentation itself. Rucker also argues that there is no evidence that the required signage, particularly an advanced railroad disc sign[3], was actually present. CSX Transportation notes that the agreement did not concern the disc sign, so it is not relevant to the preemption issue. It also presents the Declaration of the Superintendent of the White County Highway Department as evidentiary support for the presence of an advanced railroad disc sign.

Once federal funds are expended to install warning devices at a crossing and those devices are installed and operating,"state tort law is preempted." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 670 (1993) (discussing the preemptive effect of the Federal Railroad Safety Act of 1970 on negligence suits against railroads). "When the [Federal Highway

_____

[3] An advanced railroad disc sign is a round, yellow sign that says "RR" with a big black "X" through it. It is located so a motorist sees it before arriving to the area of a crossing.

Administration] FHWA approves a crossing improvement project and the State installs the warning devices using federal funds, [the federal regulations governing the Federal Railway–Highway Crossings Program ] establish a federal standard for the adequacy of those devices that displaces state tort law addressing the same subject." *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 357–58 (2000); *see also Fifth Third Bank ex rel. Trust Officer v. CSX Corp.*, 415 F. 3d 741, 747 (7th Cir. 2005) (holding that preemption in this context operates to preclude any state law claim premised upon any alleged inadequacies in railway crossing warning devices); *Randall v. Norfolk S. Ry. Co.*, 800 N.E.2d 951, 956 (Ind. Ct. App. 2003) (stating that efforts to hold the defendant railroad responsible for the adequacy of the warning devices were preempted because warning devices had been installed with federal funds under a project approved by the FHWA).

Federal preemption is an affirmative defense, and therefore the Defendant bears the burden of proof. *Cf. Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 309 (7th Cir. 2010). The Defendants have presented evidence that the traffic control signage at the crossing (identified as crossing No. 341245G) includes reflectorized cross-bucks and yield signs, and that this signage was installed with the aid of federal funds in accordance with an agreement between the Indiana Department of Transportation (INDOT) and CSX Transportation dated July 8, 2010, as Project No. 1000039. (Agreement, Ex. A to Gannaway Decl., ECF No. 48-3.) In the Memorandum in Support of Motion for Summary Judgment, defense counsel referred to the Project No. as 14039, but designated the proper exhibit—the Declaration of the Senior Rail Projects Engineer for INDOT and the attached exhibit on file as an official document with INDOT. (Mem. 5, ECF No. 49.) Rucker sought to strike Gannaway's Declaration based on

counsel's reference to Project No. 14039, which was at odds with the Agreement's reference to

Project No. 1000039. This prompted CSX Transportation's counsel to explain that it was merely

a typographical error that occurred when his dictation of "1 four zeros 39" was typed as 14039

instead of 1000039. Counsel also noted that Rucker had long been aware that the Defendants

would rely on the Agreement to establish the defense of federal preemption. (Resp. to Pls.' Mot.

to Strike, Ex. 2, ECF No. 59 (citing to an April 7, 2016, letter that accompanied a response to the

Plaintiff's Request for Production).)

The Court finds that Gannaway's Declaration is admissible. Further, when it is combined

with the Declaration of Russell Schanlaub [ECF No. 48-4] and the Supplemental Declaration of

Russell Schanlaub [ECF No. 59-4], the submissions provide the necessary evidence to meet CSX

Transportation's burden of proof on preemption. Schanlaub is the Manager of Field

Investigations for CSX Transportation. On June 13, 2013, he investigated the crash that is the

subject of this litigation. He took photographs, which he identified in a Photograph Log,

including one that showed that the signage referenced in the agreement for Project No. 1000039

was in place at the crossing.

Nevertheless, Rucker argues that summary judgment is not appropriate because

Schanlaub did not reference or photograph an advanced railroad disc sign. CSX Transportation

alleged the presence of one and cited to Schanlaub's Declaration as evidence that it was in

place.[4] However, the 2010 agreement for Project No. 1000039 makes no reference to an

---

[4] Rucker argues that this renders Schanlaub's Declarations irrelevant. The Court agrees that
Schanlaub's statements are not relevant to the existence of a sign that he did not purport to photograph.
But his Declaration remains relevant for what it does include, namely the existence of the reflectorized
cross-bucks and yield signs. Additionally, the Court rejects Rucker's argument that Schanlaub's
photographs are irrelevant because they were not taken from the vantage point of the tractor or other
vehicle. The testimony is not being offered to show the view from Allen's precise vantage point, but to

advanced railroad disc sign. Thus, its presence is not relevant for purposes of the preemption argument, and its purported absence would not defeat preemption. Federal law thus preempts any claim that the design or condition of the crossing required additional crossing devices, including an advanced warning disc. In any event, the Defendants have presented credible evidence that an advanced warning disc sign has been in place since 2004. Through the Declaration of Mike Kyburz [ECF No. 78-1], the Superintendent of the White County Highway Department, the Defendants have established that White County installed the sign on County Road 200 West on August 9, 2004. Finally, even if the warning sign was not in place, it could not have played a causative role in the collision. Allen was familiar with the area, and had crossed the railroad tracks at that same location hundreds of times. Thus, he did not need a road sign to alert him that he was approaching railroad tracks.

Because federal funds have been used to upgrade the crossing, federal regulation preempts Rucker's state law claims challenging the adequacy of the warning system for the design of the crossing.

2.    *Obstructed View*

Rucker has asserted an obstructed view claim under Indiana law. At the time of the accident, Indiana law required that:

> Each railroad in the State of Indiana shall maintain each public crossing under its control in such a manner that the operator of any licensed motor vehicle has an unobstructed view for fifteen hundred (1,500) feet in both directions along the railroad right-of-way subject only to terrain elevations or depressions, track curvature, or permanent improvements.

---

prove the existence of the signage referenced in the INDOT agreement.

Ind. Code § 8-6-7.6-1.[5] Under the Seventh Circuit's interpretation of this statute, a "motorist must have the mandated view at the point where the highway intersects the edge of the railroad right of way." *Menke v. S. Ry. Co.*, 603 F.2d 1281, 1283–84 (7th Cir. 1979); *Fifth Third Bank v. CSX Corp.*, 306 F. Supp. 2d 841, 853 (N.D. In. 2004). The law "obligate[s] the railroads to remove (subject to certain exceptions) all foliage and obstructions on the right of way which might impair a motorist's view of an oncoming train." *Cottrell v. Norfolk S. Corp.*, No. 3:05-CV-1, 2007 WL 1169693, at *3 (S.D. Ind. Apr. 18, 2007) (quoting *Menke*, 603 F.2d at 1284). This duty to remove obstruction extends only to the railroad's right-of-way. *Cottrell*, 2007 WL 1169693, at *3; *see also Menke*, 603 F.2d at 1284 & n.1 (stating that a "railroad can only be held responsible for obstructions within its control" and noting that the jury was so instructed when it was informed that the defendant railroad had "no control over, and no responsibility for, obstructions of view which are located off the railroad right-of-way").

CSX Transportation argues that Rucker has not met his burden to present admissible evidence from which a jury could find that the unidentified stand of trees in the southeast quadrant of the crossing were growing on CSX Transportation's right of way. CSX Transportation believes that it has met its summary judgment burden by showing that there is an absence of evidence to support Rucker's claim. As stated earlier, once CSX Transportation pointed out that none of the evidentiary materials could support Rucker's claim that CSX

---

[5] Effective July 1, 2016, this statute was repealed, Bureau of Motor Vehicles Omnibus Bill, Pub. L. 198-2016, § 63 (Mar. 24, 2016), and newly enacted provisions govern a railroad's duty to maintain an unobstructed view at a public rail-highway grade crossing, *see* Ind. Code §§ 8-6-7.6-3 to -4. Now, a railroad must provide either 250 feet, 350 feet, 650 feet, or 900 feet of unobstructed view, depending upon whether the crossing's warning device is "passive" or "train activated" and what the "maximum authorized speed limit" is on the track. *Id.* § 8-6-7.6-3(1)(A)–(C), (2). The Court applies the law at the time of the events giving rise to the underlying claim.

Transportation was responsible for the trees, it was incumbent on Rucker to dispute those assertions by going beyond the pleadings and "citing to particular parts of materials in the record" to establish the existence of a genuine, material, triable issue. Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 322–23 (noting that summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Rucker criticizes CSX Transportation for not providing testimony from one of its employees regarding the property boundary lines or right of way, but "a defendant moving for summary judgment need not produce evidence of its own." *Marion v. Radtke*, 641 F.3d 874, 876–77 (7th Cir. 2011). "When a plaintiff fails to produce evidence, the defendant is entitled to judgment" *Id.*

There is no doubt that "one of the basic elements of negligence is a breach of duty" and that Rucker "would bear the burden of proof on this point at trial." *Green v. Whiteco Indus., Inc.* 17 F.3d 199, 202 (7th Cir. 1994). "Absent a duty, there can be no breach, and therefore, no recovery for the plaintiff in negligence." *Pfenning v. Lineman*, 947 N.E.2d 392, 398 (Ind. 2011) (quoting *Vaughn v. Daniels Co. (W. Va.), Inc.*, 841 N.E.2d 1133, 1143 (Ind. 2006) (stating that "[t]he focus on duty arises from its role as one of the essential elements of a negligence action")).

Rucker maintains that there is a genuine issue of fact with respect to whether the trees that posed the difficulty for Allen were within CSX Transportation's right of way. He bases this on Allen's testimony that the problematic trees were "right next to the tracks, or next to the tracks." (Allen Dep. 40.) But Allen has no personal knowledge of the property boundary lines or right of ways, nor did he further define the distance he correlated with "next to" or otherwise

provide a more precise location. Even without the precise definition, the trees that Allen was referencing is probably not a mystery to the parties—they were in the southeast quadrant of the crossing in some proximity to the tracks. But that did not alleviate the need to determine who owned or controlled the property on which those trees were growing. To bolster his claim that there is evidence that a jury could rely upon to find that it was CSX Transportation who had a duty with respect to those trees, Rucker attempts to rely on the testimony of Brian Pogue, who is the site manager for Rockland Flooring, a company that owns property east of County Road 200 West that is bounded on the north by the CSX Transportation right of way. According to Rucker, "Pogue has testified to his understanding that the CSX right of way in the area of the subject crossing may extend as far out as fifty (50) feet from the center of the track." (Pls.' Suppl. Mem. 11 (citing Pogue Dep. 39).) The Court does not find Pogue's testimony to be helpful to Rucker. The question posed to Pogue was whether he could "point to an area" on a photograph of an area east of County Road 200 West and south of CSX Transportation tracks "or give me some point of reference as to where the CSX right-of-way ends." (Pogue Dep. 39, ECF No. 72-1.) Pogue answered, "No, I can't." (*Id.*) When pressed whether he had "any appreciation for how far it extends out from the southernmost rail in the photographs," he responded, "Not with any certainty. I have heard 50-foot but I don't know that." (*Id.*)

Pogue's statement about what he heard is inadmissible hearsay, at least for purposes of establishing how far the right of way extended. Additionally, Pogue clearly admits that he does not have personal knowledge, looking at the photograph, where the right of way would abut Rockland Flooring's property. Nor could he tell, looking at the photograph, whether any of the trees pictured were within or beyond fifty feet from the centerline of the track. (*Id.* at 42 (stating

that "the best way to tell would be the surveyor"). He was simply aware that Rockland

Flooring's property included trees that were located in the area of the boundary.

Summary judgment is the moment in litigation where the non-moving party is required to

marshal and present the court with evidence on which a reasonable jury could rely to find in his

favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Rucker, despite

CSX Transportation's claim that the trees at issue were not on its right of way, has not provided

any evidence to further identify the trees that he alleges created an obstruction, or to prove that

they were on CSX Transportation's right of way. Without any credible proof upon which a jury

could rely to conclude that CSX Transportation had a duty, breached that duty, and the breach

caused the accident,[6] CSX Transportation is entitled to judgment as a matter of law.


### C.     FELA Claim Against Amtrak Based on the Condition of the Crossing

The tracks upon which the Amtrak train were operating at the point of the collision

belong to CSX Transportation. Despite this, Rucker claims that, under FELA, Amtrak owed him

a non-delegable duty to provide him "with a safe place to work which admittedly included the

---

[6] Although not briefed by the parties, the record suggest that the Rucker would have difficulty establishing the necessary proximate cause.

> An essential element in a cause of action for negligence is the requirement for a reasonable connection between a defendant's conduct and the damages which a plaintiff has suffered. W. Prosser & W. Keeton, *The Law of Torts* § 41 at 263–66 (5th ed. 1984). This element requires, at a minimum, causation in fact—that is, that the harm would not have occurred "but for" the defendant's conduct. The "but for" analysis presupposes that, absent the tortious conduct, a plaintiff would have been spared suffering the claimed harm.

*Cowe by Cowe v. Forum Grp., Inc.*, 575 N.E.2d 630, 635 (Ind. 1991). Allen's admission that he did not stop at the crossing to look for a train before driving onto the tracks would frustrate any attempt to argue that the trees were a but for cause of the accident.

tracks on which the train was being operated." (Pls.' Suppl. Mem. 13.) Rucker does not cite to

any legal authority for his position that Amtrak, even though it did not own the tracks, could be

liable to its employee for the condition of the track and, thus, the crossing. The reference to

"admittedly" in his brief appears connected to his argument that Harold Abrahamson, one of the

attorneys for Amtrak and CSX Transportation, "has admitted that the tracks upon which a

locomotive engineer (i.e.—William Rucker) is operating a train constitute part of his

workplace." (*Id.* (citing Abrahamson Dep. 11.) Putting aside the fact that the identified statement

of counsel says nothing about who is responsible for maintaining that portion of Rucker's

"workplace,"[7] Rucker does not explain how an attorney's statement is a proper substitute for

---

[7] Abrahamson was deposed on May 3, 2017, with respect to a Declaration he made in connection with the Motion for Summary Judgment. The Declaration identified a photograph that Abrahamson took on July 5, 2015, at the County Road 200 West crossing. It also referenced a photograph taken by Schanlaub on June 12, 2013. Both of these photographs had been attached to Pogue's Declaration because he referenced them in connection with identifying who owned the property on which the stand of trees in the southeast corner of the crossing were located. After testifying about the photographs, the questioning by Plaintiff's counsel turned to who owned the tracks at the crossing, which was admittedly CSX Transportation.

> Q.     And there is an agreement between Amtrak and CSX which allows Amtrak trains
>        to operate its train on CSX tracks at the time and location of the June 12, 2013
>        crossing accident?
>
> A.     That's correct.
>
> Q.     You would agree with me that CSX providing and maintaining tracks for use by
>        Amtrak is an operational activity of Amtrak? Correct?
>
>                                    * * *
>
> A.     I don't know.
>
> Q.     Well, the train's gotta run somewhere. Right?
>
> A.     You're say "operational activity," I don't know what an operational activity
>        means. They have an agreement that they operate trains on CSX tracks at that
>        location.

proof or for legal authority. It would be no different than if Rucker's counsel made the assertion—which of course is not evidence or legal authority. In the end, the same reasons that support summary judgment in favor of CSX Transportation related to the design of the crossing would support summary judgment in favor of Amtrak if Amtrak indeed had any legal obligations related to the crossing.

**D.**      **Marie Rucker's Loss of Consortium Claims**

CSX Transportation requests summary judgment on Mr. Rucker's loss of consortium claims because they are derivative of her husband's claims. Because the Court agrees that CSX Transportation is entitled to judgment as a matter of law on Ruckers' tort claims against it, so too

---

Q.      And as you sit here today, you're not willing to say that the operation of the train over these tracks is an operational activity?

A.      I don't think—I don't understand what you're asking me.

Q.      Would you agree with me that CSX is an agent of Amtrak under the Federal Employers Liability Act with respect to this accident?

A.      No, I would not.

Q.      Would you agree with me that the tracks upon which a locomotive engineer is operating a train constitute part of his workplace?

A.      I would agree with that.

Q.      You would also agree with me that the Federal Employer Liability Act allows a railroad worker employee to recover his entire damages from his railroad employer whose negligence jointly caused an injury?

A.      I don't think I want to answer that with regard to legal opinions as to what the act provides and what the act doesn't provide. My understanding is I was here today to answer questions concerning . . . my declaration.

(Abrahamson Dep. 10–11, ECF No. 72-3.) The deposition then concluded.

does it agree that Mrs. Rucker has no viable loss of consortium claim.

## CONCLUSION

For the reasons stated above, the Court GRANTS National Railroad Passenger Corporation d/b/a Amtrak's and CSX Transportation, Inc.'s Motion for Summary Judgment [ECF No. 48]. The Plaintiff's Motion to Strike Exhibits to the Motion for Summary Judgment [ECF No. 51] is TERMED. The Defendants' Motion to Strike the Affidavit and Report of Stuart Nightenhenlser [ECF No. 60] is RENDERED MOOT. The Plaintiffs' Motion to Strike the Defendants' Supplemental Designation of Evidence in Support of Motion for Summary Judgment [ECF No. 63] is DENIED. The Defendant's Motion to Strike Portions of the Deposition of Brian Pogue [ECF No. 77] is RENDERED MOOT.

SO ORDERED on August 28, 2017.

 s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT